## MUTUAL LIFE INS. CO. v. GARNER.
### No. 7437.

Circuit Court of Appeals, Fifth Circuit.

Feb. 13, 1935.

Geo. P. Raney, of Tampa, Fla., for appellant.

Jim C. Clements, of Fort Myers, Fla., and G. L. Reeves, of Tampa, Fla., for appellee.

Before BRYAN, FOSTER, and HUTCHESON, Circuit Judges.

BRYAN, Circuit Judge.

This is an action on four policies of life insurance which bind the insurance company to pay an aggregate of $15,000 upon proof of the death of the insured, James F. Garner, and an additional $15,000, called double indemnity, upon proof that his death resulted from bodily injury effected solely through external, violent, and accidental means. The insured died on January 20, 1932, of a gunshot wound. His widow, the beneficiary named in the policies, sued to collect the double indemnity, claiming that death was accidental. The insurance company relied on the defense of suicide. The trial resulted in a verdict and judgment for the plaintiff. The defendant appeals on the sole ground that the trial court erred in denying its motion for a directed verdict.

The death of the insured occurred in the dining room of his home, while apparently he was engaged in cleaning his guns. A load of No. 8 shot from a 20-gauge Remington automatic shotgun entered the front left side of his body about three inches from the navel and some five inches below the apex of the heart, ranging upward. The wound showed no powder burns and was about an inch in diameter. Garner's height was six feet, and the gun 45 inches in length, with an open bore five-eighths of an inch in diameter. His wife and ten year old son, who were the only other occupants of the house, upon hearing the report of the gun, rushed from the back porch into the dining room where they saw the insured still standing, although he fell almost immediately afterwards and died within a few minutes without speaking. After he fell the Remington shotgun was at his feet, the discharged shell to his right, a loaded shell in the barrel, but none in the magazine. A jointed ramrod was on the floor near his right hand; it had no attachment on it for cleaning the gun, but soiled wads of paper and rags were on the floor, or the mantelpiece, or the dining room table. Immediately before receiving his fatal wound the insured had been cleaning another shotgun and a rifle, and his son had just stepped out of the dining room onto the back porch where his mother was. The plaintiff accounted for the gun being loaded by testifying that two days before she had been hunting with her husband, and that on his way home he left two loaded shells in the gun which had not been taken out. There was testimony to the effect that the insured was preparing to go hunting with a companion on the afternoon of the same day, and that he habitually cleaned the barrels of his guns without removing the barrel from the stock

by pushing paper wads through the barrel with a ramrod. There was some apparent though little real conflict in the evidence as to whether a Remington shotgun would go off unless the trigger were pulled. The evidence as a whole tended to show that such a gun, when cleaned and in good condition, could only be fired by pressing the trigger with the safety off, but that it was liable to explode a shell in the barrel upon being slightly jarred even with the safety on, if foreign matter, such as burnt powder or grains of sand, should get into the mechanism that controls the hammer.

At the time of his death the insured was and for 15 years had been clerk of the circuit court for Lee County, Fla., and intended to become a candidate in the general primary election of June, 1932, for another four-year term. As such clerk he was ex officio clerk to the board of county commissioners, and had been allowed by that board $17,000 as salary in the latter capacity during the years 1925 to 1930, inclusive. Upon an audit by the state auditing department through 1929, Garner's accounts had all been approved; but according to a later audit which included the year 1930 no deduction was allowed on account of salary as clerk to the board of county commissioners, and Garner was reported to be short in his accounts as clerk of the circuit court in the sum of $25,000. If the salary he received from the board be deducted, the shortage claimed would still be $8,000, of which, however, only $114.69 accrued prior to 1930. A copy of the auditor's report was mailed to and received by Garner in October of that year, and it was his duty as clerk to record it, but he did not do so, and denied to the chairman of the board that he had received it. The chairman requested and received a copy from the auditing department, and on January 8, 1932, the board passed a resolution requiring Garner to appear before it on January 20 and explain his alleged shortage. Garner had taken the position that he was entitled to the salary he had received from the board of county commissioners, although after his death a similar contention was rejected by the Supreme Court. Orange County v. Robinson, 110 Fla. 318, 149 So. 19. He had also undertaken to explain his failure to record the auditor's report, and his denial of having received it, by saying that he wanted an opportunity to check it over and to show that the claim of shortage as to the balance of $8,000 was unfounded. It had become publicly known by newspaper report and otherwise that Garner had received the auditor's report, and that his statement to the contrary was not true. On the morning of January 20, the day of his death, and the day he was to appear before the board, he had read the morning paper which contained an article about the board meeting, and its object. Garner had not been threatened with criminal prosecution. Whether he was financially able to make good the alleged shortage does not appear. In support of its theory of suicide, defendant points to Garner's alleged shortage, to his false statement concerning receipt of the auditor's report, and to the effect both would have upon public sentiment. As against this, there was evidence for plaintiff that the insured did not appear to be worried either about the claim of shortage, which he seemed to be confident he would be able to refute, or about the publicity that had been given to his conduct concerning the auditor's report; that he was of a happy, cheerful disposition, devoted to his family, had slept well the night before, and appeared to be perfectly normal in every way on the morning of his death.

In our opinion, the circumstances attending the death of the insured were such as to authorize the jury as reasonable men to reject the theory of suicide and to accept that of accident. It is undisputed that the insured at the moment of his death had just completed cleaning two of his guns and apparently had picked up the third gun with the intention of cleaning it. There was substantial evidence to support the conclusions that the gun with which he was killed had been loaded several days before and had remained loaded up to the time when he took hold of it; and that if subjected to a jar that gun would go off without pressure upon the trigger. It is a fair inference also that Garner thought the gun was not loaded. The absence of powder burns and the size of the wound seem to indicate that the muzzle was held not against or within a few inches of, but some two feet or more away from, Garner's body as the gun was fired. If this is what happened, the jury may well have found that Garner's death was caused by accident rather than by suicide. Defendant lays great stress on the circumstances that the ramrod was found on the floor by Garner's body and near his right hand, and that it had no attachment for cleaning or swabbing out the gun barrel. But the ramrod might have been on the floor when the gun went off, or if Garner had it in his hand, it does not follow that he

used it to push against the trigger, since he could have had it for the purpose of swabbing out the barrel with paper wads, and therefore would have had no use for an attachment. It was within the province of the jury to find, with the aid of the presumption against suicide, that Garner was not sufficiently influenced by the alleged shortage in his accounts and the unfavorable publicity resulting from his conduct with reference to the auditor's report, to induce him to commit suicide, in view of testimony for the plaintiff tending to show that he did not appear to be worried or to take very seriously the charges against him. On the whole, we conclude that the case was one for the jury and not for the court to decide.

The judgment is affirmed.